UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

FLAGSHIP LIVING TRUST, for the benefit of PATRICK S. KITTLER, an individual,

Plaintiff,

v.

LMA UNDERWRITING AGENCY, INC., FRONTLINE PROCESSING CORPORATION, CHRISTOPHER KITTLER, and RONALD REAVIS,

Defendants.

CIVIL NO. 01-656 (MJD/JSM)

REPORT AND RECOMMENDATION

The above matter came before the undersigned United States Magistrate Judge on defendants' Motion for Summary Judgment, For Sanctions and Attorneys' Fees [Docket No. 106]. Robert Stewart, Esq.[1] appeared on behalf of plaintiff Flagship Living

---

[1] Plaintiff's local counsel did not appear at the hearing. In addition, the Court notes that plaintiff's local counsel, John Thompson and Peter Gray of the Rider Bennett law firm, failed to sign plaintiff's responsive brief to defendants' motion, in contravention of the Federal Rules. See FED. R. CIV. P. 7, 11 (requiring all motions to be signed by an attorney of record). Further, at the hearing and in their reply memorandum, defendant's counsel informed the Court that he contacted Thompson and Gray regarding this omission and was informed that counsel had intentionally not signed plaintiff's response. The Court does not take this conduct of local counsel lightly (not signing the pleadings and informing defendant's counsel that this was intentional) and reminds local counsel that while they are still representing plaintiff, they are required to fulfill their duty of representation competently and fully.

Trust, for the benefit of Patrick S. Kittler (hereafter collectively referred to as "Patrick"). Eric Braaten, Esq. appeared on behalf of defendants, except defendant Ronald Reavis.[2]

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c). For the reasons discussed below, it is recommended that defendants' Motion for Summary Judgment, For Sanctions and For Attorneys' Fees [Docket No. 106] be granted in part and denied in part. In this regard, defendants' motion should be denied with respect to Counts One through Fourteen and Count Sixteen, and granted as to Count Fifteen; and defendants' motion for sanctions and attorneys' fees should be denied.

## I. STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

[2] Defendant Ronald Reavis was formerly defendant Frontline's secretary. A default judgment was entered against Reavis on May 17, 2002 [Docket No. 41].

entry of summary judgment.'" DePugh v. Smith, 880 F.Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

## II. FACTS

### A. Background to Dispute

Defendant Christopher Kittler ("Christopher") and his father, J. Patrick Kittler ("J. Patrick"), began a company called Market Makers in the late 1980's. See Declaration of James Patrick Kittler ("J. P. Kittler Decl."), ¶ 2. According to J. Patrick, Market Makers was started as a 50/50 partnership "to take advantage of a business opportunity I created to generate income while the partnership developed a business

Christopher wished to pursue," the ISO business."[3] J. P. Kittler Decl. ¶¶ 2, 4. J. Patrick stated that he and his wife provided the entire cash flow for Market Makers during its first year of business, that he personally guaranteed loans in excess of $200,000 to fund the company, and that, "[f]rom time to time," Patrick borrowed money from his parents and sister to finance the company. J. P. Kittler Decl. ¶ 3. J. Patrick stated that he was not aware of any independent investment of Christopher in Market Makers. See J. P. Kittler Decl. ¶ 3.

Christopher was "primarily responsible for running the company and had managed to bring in a client that accounted for 90% of the company's business." Defs' Memo., p. 2; see also Defendants' Exhibits to Motion for Summary Judgment ("Defs' Exhs.") [Docket No. 108], Affidavit of Eric Braaten ("Braaten Aff.") Exh. P (Deposition of Patrick Kittler ("Patrick Depo."), p. 83-84). Patrick Kittler began working for Market Makers as a salesperson and did not have an ownership interest in the company when he started working for Market Makers. Defs' Exhs., Braaten Aff. Exh. P (Patrick Depo.), p. 85-86. Subsequently, as a result of the work of both Christopher and Patrick, Market Makers was able to receive third party loans. See J. Patrick Decl. ¶ 3.

In 1989, according to J. Patrick, the opportunity to develop an ISO business arose from Christopher's efforts, as supported by Market Makers. J. P. Kittler Decl. ¶ 4. In this regard, J. Patrick stated that he introduced Christopher to members of the board of directors of a bank and a venture capital firm to secure the necessary funding for the ISO business, introduced Christopher to Lloyds of London, and negotiated the final deal

---

3 According to defendants, an ISO processes credit cards or credit card transactions on behalf of merchants.

between Llyods and Market Makers for an indemnification insurance policy. See J. P. Kittler Decl. ¶¶ 4-5. J. Patrick also stated that, at that time, he recommended that this indemnification policy "be used to build a merchant portfolio of the type now being marketed by [defendant] Frontline." J. P. Kittler Decl. ¶ 5.

In 1990, as soon as Market Makers started to be profitable, Christopher drafted incorporation papers in an attempt to take control of Market Makers by converting J. Patrick into a 49% shareholder and himself into a 51% shareholder. See J. P. Kittler Decl. ¶ 6. J. Patrick stated that he refused this offer and that Market Makers remained a 50/50 partnership. See J. P. Kittler Decl. ¶ 6. J. Patrick stated that J. Patrick Kittler gifted his 50% interest in Market Makers to Patrick in 1991. See J. Patrick Decl. ¶ 7; Declaration of Patrick Kittler dated March 8, 2004 ("Patrick March 8, 2004 Decl."), p. 1.

Christopher stated that Market Makers became profitable when he secured its primary client, he "turned over operation of Market Makers to Patrick and began to focus on another business" and, in 1990, formed a company called London Marketing Associates ("LMA"). Defs' Memo., p. 2.

On the other hand, Patrick alleged in the Amended Complaint the following: LMA was incorporated in Minnesota in 1990 under the name London Marketing Associates by Patrick Kittler and his brother, defendant Christopher Kittler. See Defs' Exhs., Braaten Aff. Exh. A (Verified Amended Complaint), ¶ 8. Patrick and Christopher formed LMA intending to market products and services within the credit card industry and begin work as an ISO. See Defs' Exhs., Braaten Aff. Exh. A (Verified Amended Complaint), ¶¶ 9-11. Both were involved in running LMA. See Defs' Exhs., Braaten Aff. Exh. A (Verified Amended Complaint), ¶¶ 9-12. To create the funding needed to establish LMA

as an ISO, LMA sold an insurance product that protected merchants and banks when customers did not pay for merchandise charged to credit cards. See Defs' Exhs., Braaten Aff. Exh. A (Verified Amended Complaint), ¶ 9. Patrick and Christopher planned to use the earnings from the insurance product to build LMA into an ISO. See Defs' Exhs., Braaten Aff. Exh. A (Verified Amended Complaint), ¶ 11.

## B. Patrick's Ownership Interest in LMA

### 1. Patrick's Version of the Facts Establishing His Ownership Interest in LMA

Patrick has alleged that he and Christopher each had held 50% of the interest in LMA, according to an oral agreement between them, but that they reached a written agreement in 1995 to re-distribute their interests. See Defs' Exhs., Braaten Aff. Exh. P (Patrick Depo.), p. 115-16. Specifically, Patrick alleged that on June 27, 1995, he and Christopher entered into a written agreement whereby Patrick transferred 20% of his interest in LMA to Christopher, and thereafter Christopher owned 70% and Patrick owned 30% of LMA, entitling Patrick to 30% of LMA's profits. See Patrick Decl., p. 2-3. In this regard, the agreement stated:

> Your [Christopher] request for me to relinquish 20% more of the 50% that I [Patrick] own in our company to you in consideration of your continued dedication to its operation in my absence is acceptable to me under the following conditions.
>
> You will stay with the company and continue to develop our goal of becoming the industry leader for Merchant Chargeback Insurance, as competition will inevitably surface.
>
> You will provide our mother with income opportunities that are equal to at least half of the profit of the 20% that I am

> giving you if whenever possible. I will do the same for as much and as long as possible.
>
> You will provide me with regular updates and copies of tax returns and accountings for the company.
>
> You will stick to the 1/3, 1/3, 1/3 plan when we grow more and have better profits.
>
> The bylaws will be changed to reflect 75% of 'shareholder' vs. 'board of directors' needed to pass major corporate changes.
>
> When we are finally able to start the long awaited ISO, you will provide me and/or mother the 30% profits of its operation and it's [sic] sale, once it is large enough to cash out like Mitch.

Defs' Exhs., Braaten Aff. Exh. I ("1995 written Agreement").

The 1995 written Agreement was reached because Patrick "began to fall ill after the end of remission of a potentially fatal disease diagnosed in 1984," leaving Christopher to continue working for the company full-time. Patrick Decl., p. 2-3.

As evidence of this Agreement, Patrick points to the following facts:

- In the late 1980s, Christopher and J. Patrick Kittler began a 50/50 partnership under the name of Market Makers. See J. P. Kittler Decl. ¶ 2.

- In 1990, Christopher had incorporation papers drawn up, and attempted to take control of Market Makers by converting J. Patrick into a 49% shareholder and himself to a 51% shareholder. J. Patrick refused, and the 50% arrangement remained. See J. P. Kittler Decl. ¶ 6.

- In 1991, J. Patrick Kittler gifted his 50% interest in Market Makers to Patrick. See J. P. Kittler Decl. ¶ 7.

- J. Patrick stated that both Christopher and Patrick told him that they had reached an agreement regarding the transfer of 30% ownership of LMA, health insurance, other compensation, and financial support of

Patrick and his mother, and that Patrick's stock certificates had been issued to him. See J. Patrick Kittler Decl. ¶¶ 9-10.

- In 1995,[4] Patrick was issued a certificate for 214 shares of LMA. This share certificate stated that it is "paid in full and nonassessable." See Stewart Aff. Exh. B (Christopher Depo., Exh. 27).

- On December 21, 2000, Frank Bennett, former attorney for LMA, wrote a letter stating that Patrick had been issued stock certificates representing a 30% ownership interest in LMA in August 1995. See Affidavit of Peter Gray ("Gray Aff.") [Docket No. 21], Exh. E.

- Beginning in 1995, until Patrick filed the instant lawsuit in 2001, LMA paid dividends to Patrick, as a 30% shareholder, and made regular payments to Patrick's mother. See Defs' Exhs., Braaten Aff. Exhs. F, Q (Christopher Depo.), p. 77-78; Stewart Aff. Exh. C (Deposition of Ronald Reavis ("Reavis Depo."), Exh. 27), p. 88.

- LMA's accountants, Eiden and Newberg, testified that they were given inconsistent information regarding the ownership of LMA, but that they were subsequently told that Patrick was a 30% shareholder of LMA. See Stewart Aff. Exh. D (Deposition of Kenneth Eiden III ("Eiden Depo.")), p. 34; Stewart Aff. Exh. E (Deposition of Randy Newberg ("Newberg Depo.")), p. 58.

- In December 1999, Patrick transferred his shares in LMA to Flagship Living Trust, with the approval of defendants. At that time, defendants made no objections to this transfer or contested Patrick's ownership of the LMA shares.

- After this lawsuit was filed, defendants moved to stay all proceedings, arguing that Patrick, as a minority shareholder, did not have the right to bring derivative claims on behalf of LMA until a committee appointed by LMA's Board of Directors had first investigated the claims. See Stewart Aff. Exh. G (Transcript of Hearing held February 8, 2002), p. 5-6.

- Christopher has a history of claiming that his signature was forged on documents and lying. See Stewart Aff. Exhs. B (Christopher Depo.), p. 11-25; C (Reavis Depo.), p. 9-15.

---

[4] The share certificate is undated. See Stewart Aff. Exh. B (Christopher Depo., Exh. 27).

- Reavis testified that Christopher told him that Patrick owned part of Frontline. In this regard, Reavis testified that "[s]ometimes Chris said Patrick owned part [of Frontline], sometimes he said screw him, doesn't own a thing."[5]

### 2. Christopher's Version of the Facts Establishing Patrick's Ownership Interest in LMA

Christopher contests the authenticity of the alleged 1995 written Agreement, arguing that his signature is a forgery and the document is fabricated. According to Christopher, Patrick never owned 50% of LMA. Rather, according to Christopher, pursuant to an oral agreement, he gave Patrick a 30% interest in LMA in 1995, contingent on specific conditions. See Defs' Exhs., Braaten Aff. Exh. Q (Deposition of Christopher ("Christopher Depo.")), p. 66-70. These conditions included Patrick's future services to LMA regarding the Hawk computer system. See Defs' Exhs., Braaten Aff. Exh. Q (Christopher Depo.), p. 66-69. However, because Patrick did not satisfy these conditions, Christopher claims that this agreement was nullified.[6] See Defendants' Memorandum in Support of Summary Judgment ("Defs' Mem."), p. 4.

---

[5] Patrick cited to page 7 of the Reavis deposition for this statement. See Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pls' Mem."), p, 7. However, the Court did not find this topic or language on page 7 of the transcript excerpts provided to the Court of the Reavis deposition. See Stewart Aff Exh. C (Reavis Depo.), p. 7. However, Reavis did testify that he and Christopher had discussions of potential lawsuits arising from the lack of separation between LMA and Frontline and that Patrick did come up in such conversations. See Stewart Aff Exh. C (Reavis Depo.), p. 46.

[6] In opposition to this claim, Patrick stated that the Hawk System was ultimately not used because customers refused to authorize LMA to download the necessary data for the system. See Stewart Aff. Exh. A (Deposition of Patrick Kittler ("Patrick Depo.")), p. 215-16. In addition, Patrick argued that based on Minn. Stat. § 302A.405, subd. 3(a), the language on the share certificate stating that it is "paid in full and nonassessable" precludes defendants from contending that the shares issued to Patrick were "somehow revoked."

In support of Christopher's claim that Patrick had forged the 1995 Agreement, defendants presented the Court the following facts:

- During discovery, defendants sought production of the original 1995 contract for inspection. In response to this request, Patrick stated "[t]he original of the letter was turned over at the time it was executed to Frank Bennett." Defs' Exhs., Braaten Aff. Exh. N (Response to Request No. 11). Patrick also testified that he signed the original 1995 contract in the office of LMA's attorney, Frank Bennett, and that the original 1995 contract was given to Bennett, who reviewed and commented on the contract. See Defs' Exhs., Braaten Aff. Exh. P (Patrick Depo.), p. 146-48. Patrick stated that the original contract had been given to Bennett because he maintained LMA's records. Id.

- Flagship's counsel subpoenaed Bennett and the documents of Bennett's present law firm, Lindquist & Vennum.[7] Michael Freeman of Lindquist & Vennum stated, in a letter to Patrick's counsel regarding the subpoena, "all the client records in the Patrick Kittler case referred to in Exhibit A to the subpoena has [sic] already been turned over to Eric Braaten [attorney for defendants LMA, Frontline and Christopher]." Letter from Michael Freeman to Peter Gray dated July 31, 2002 (referencing Freeman's April 17, 2002, letter to Peter Gray).

- On November 5, 2003, Frank Bennett was deposed and Lindquist & Vennum's files were reviewed in connection with the subpoena issued in July 2002. The 1995 written Agreement was not found in the Lindquist & Vennum files. In addition, Bennett testified that he did not recall whether or not such an agreement was entered into and stated that he did not have any knowledge of such an agreement. See Defs' Exhs., Braaten Aff. Exh. S (Deposition of Frank Bennett ("Bennett Depo.")), p. 20-23, 25-27.

- Defendants retained a handwriting expert to analyze Christopher's signature on the 1995 contract. The expert compared Christopher's signature on the 1995 contract to his signature on a corporate record signature page and concluded that, "[b]ased on the unique pattern of reproduction of the 'Christopher Kittler' signatures appearing on Exhibits Q-1 and K-1, it is highly probable that one is a model signature

[7] LMA objected to this subpoena. On July 26, 2002, Magistrate Judge Nelson issued an order overruling LMA's objections and requesting that Lindquist & Vennum's counsel contact the court in writing if it objected to the subpoena. In response, Lindquist & Vennum did not lodge any objections with the court.

for the second or that both signatures are created from a common model."[8] Defs' Exhs., Affidavit of Karen Runyon ("Runyon Aff.") Exh. A, p. 3. Defendants have not produced an expert to rebut defendants' handwriting expert and the deadline for disclosing such an expert has passed. See Third Amended Pretrial Scheduling Order [Docket No. 93]; see also Defs' Exhs., Braaten Aff. Exh. H.

- In the Verified Amended Complaint, Patrick alleged that he and Christopher each owned 50% of LMA when it was incorporated in 1990. See Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶¶ 8, 12. This was reiterated in Patrick's Declaration dated June 28, 2001. See Defs' Exhs., Braaten Aff. Exh. B (Declaration of Patrick Kittler ("Patrick Decl.")) ¶ 3. However, the corporate records show that Patrick was not a shareholder of LMA when LMA was incorporated. See Defs' Exhs., Braaten Add. Exhs. C, D. Patrick subsequently admitted that, contrary to the allegations in the Verified Amended Complaint and his Declaration, he was not a shareholder of LMA at its inception, that the brothers entered an oral agreement shortly after the incorporation of LMA to share the ownership equally, and that he was issued shares in LMA in 1995. See Defs' Exhs., Braaten Aff. Exh. P (Patrick Depo.), p. 115-16.

- Although J. Patrick submitted a Declaration asserting that he gifted Patrick his 50% interest in Market Makers in 1991, J. Patrick wrote a letter to Christopher, dated November 3, 1999, regarding "the partnership that started LMA." Affidavit of Eric Braaten dated March 12, 2004 ("Braaten March 12, 2004 Aff.") Exh. 1. In this letter, J. Patrick stated "[t]o protect these claims, I must now demand, and therefore do demand, an accounting for my 50% interest in LMA Underwriting Agency, Inc. That business arose out of the earnings of Market Makers." Braaten March 12, 2004 Aff. Exh. 1.

Notwithstanding the factual disputes surrounding the 1995 written Agreement, Christopher admitted that his signature on the share certificate for 214 shares of LMA, given to Patrick in 1995, is genuine and that the oral agreement Christopher has alleged

---

8 The expert stated, however, that an examination of the original or an early generation copy of the 1995 contract would be necessary before conducting a final evaluation of the signatures. See Defs. Exhs, Runyon Aff. Exh. A, p. 4.

was not documented in any way. See Stewart Aff. Exh. B (Christopher Depo. Exh. 27), p. 66-69, 164.

**C. Formation of Frontline**

In early 1998, LMA was involved in litigation with Utica Mutual Insurance Company ("Utica"), the underwriter for its Merchant Chargeback Insurance. The litigation arose when one of LMA's clients filed a claim under its policy and Utica denied the claim. According to Christopher, Utica's denial of the claim had severe consequences for LMA's business. See Stewart Aff. Exh. B (Christopher Depo.), p. 113-14. Christopher asserted that, as a result of these consequences, LMA became no longer viable and, at that time, a final distribution of LMA was made, with 70% paid to Christopher and 30% paid to Patrick. See Stewart Aff. Exh. B (Christopher Depo.), p. 114-15; see also Stewart Aff. Exh. C (Reavis Depo.), p. 88.[9]

Christopher maintained that he used his share of the distribution from LMA to start an ISO business, defendant Frontline Processing Corporation ("Frontline"). See Stewart Aff. Exh. B (Christopher Depo.), p. 115. Frontline was incorporated in Nevada on October 26, 1998, with Christopher as its registered agent, sole director, and president.[10]

---

[9] Neither Reavis nor Christopher testified as to the date of this final distribution. A document was shown to Reavis during his deposition showing that a distribution was made, 30% to Patrick and 70% to Christopher, in May 1999. However, Reavis did not testify as to dates and did not testify that this was a final distribution. See Stewart Aff. Exh. C (Reavis Depo.), Exh. 27.

[10] According to Christopher, he invited Patrick to move to Montana and work for Frontline, but Patrick declined. See Stewart Aff. Exh. B (Christopher Depo.), p. 65. In this regard, Patrick testified that Christopher did ask him to move to Montana, but he did

On the other hand, Patrick contends that, in fact, LMA's money, assets, and other resources were all used to establish Frontline. See Stewart Aff. Exh. H (Expert Report). In this regard, in opposition to defendants' motion, Patrick presented the following facts:

- The capital used to start Frontline was transferred from LMA's accounts: LMA gave money to Frontline and this money was treated by LMA as an ISO expense. See Stewart Aff. Exh. C (Reavis Depo.), p. 77. By December 1999, LMA's financial statements showed that it had paid $415,000 in ISO expenses during 1999. See Stewart Aff. Exh. B (Christopher Depo., Exh. 19), p. 138-39. In this regard, Christopher had LMA write a check to Frontline for $350,000 on March 3, 1999. See Stewart Aff. Exh. B (Christopher Depo.), p. 115, 138-39. In addition, in 1998, LMA hired and paid a consultant to help establish a banking relationship for the ISO business, Ken Tullos. See Stewart Aff. Exh. C (Reavis Depo.), p. 34-36.

- At the time of Frontline's incorporation, all of the assets shown on its balance sheet were taken from LMA. See Stewart Aff. Exh. C (Reavis Depo., Exh. 11), p. 49.

- Although Frontline was started in 1998, it did not pay any wages to any employees until the second half of 1999 and, until that time, all of its business was done by employees paid by LMA. In addition, the money spent paying LMA employees to start Frontline has not ever been re-paid to LMA. See Stewart Aff. Exh. C (Reavis Depo.), p. 86-87; Stewart Aff. Exh. D. (Eiden Depo.), p. 28-30. Christopher admitted that LMA's employees worked to start Frontline and that no accounting was done to establish the value of the employees' time. See Stewart Aff. Exh. B (Christopher Depo., Exh. 14), p. 122-25.

- Elizabeth Decrescenzo, an employee of LMA, testified that she worked to establish Frontline, developing its relationships with customers and Visa/Mastercard and "monitor[ing] its day-to-day transactions" while being paid solely by LMA. See Stewart Aff. Exh. F (Deposition of Elizabeth Decrescenzo ("Decrescenzo Depo.")), p. 11-13.

---

not recall the circumstances of this request. See Defs' Exhs., Braaten Aff. Exh. P (Patrick Depo.), p. 171-72.

- J. Patrick Kittler, Christopher and Patrick's father, drafted contracts and agreements establishing Frontline in the ISO business in 1998 and was paid for this service by LMA. See J. Patrick Kittler Decl. ¶ 12.

- Once Frontline did begin paying its employees, employees continued to perform work for both LMA and Frontline, without tracking the time they spent for each company. See Stewart Aff. Exh. C (Reavis Depo.), p. 45-46.

- LMA paid for, and LMA employees prepared, Frontline's Policy and Procedures Manual and Merchant Application forms. See Stewart Aff. Exh. C (Reavis Depo., Exh. 11), p. 59-60.

- Frontline took LMA's customer lists and other intangible property and did not compensate LMA for this property. See Stewart Aff. Exh. E (Newberg Depo., Exh. 2), p. 16.

- In the early stages of Frontline's business, it solicited business from LMA's customers and some of LMA's customers became Frontline's customers. See Stewart Aff. Exh. C (Reavis Depo.), p. 41; Stewart Aff. Exh. B (Christopher Depo.), p. 131-33. No compensation was made to LMA. See Stewart Aff. Exh. B (Christopher Depo.), p. 132-33.

- For an ISO business to function, it must have a relationship with a bank. The bank, however, required LMA to sign an ISO agreement and act as a guarantor for Frontline's debts. See Stewart Aff. Exhs. B (Christopher Depo.), p. 139-40; C (Reavis Depo., Exh. 11), p. 48. In addition, the bank statements given to the bank to establish the ISO's credit worthiness were LMA's financial statements. See Stewart Aff. Exh. C (Reavis Depo., Exh. 11), p. 48-49.

- Once Frontline's business was established and was making a profit, LMA's employees were transferred to Frontline and their LMA employment contracts were cancelled and replaced with new Frontline employment contracts. LMA was not compensated for this loss of employees. See Stewart Aff. Exhs. B (Christopher Depo.), p. 121-22; C (Reavis Depo.), p. 44. Moreover, management ceased running LMA's business once Frontline became profitable. In this regard, Christopher explained that "it would be ridiculous to try to do both [businesses] out of one place." Stewart Aff. Exh. B (Christopher Depo.), p. 56; see also Stewart Aff. Exh. C (Reavis Depo.), p. 91-92.

- Kenneth Eiden, Frontline's current accountant, testified that in 2002 and 2003, he went back and re-wrote LMA and Frontline's financial records. See Stewart Aff. Exh. D (Eiden Depo.), p. 5-13. This included re-

characterizing the funds transferred from LMA to Frontline in 1999: the $350,000 payment that had been made directly from LMA to Frontline was changed to a "loan to" Christopher. See Stewart Aff. Exh. D (Eiden Depo.), p. 22-23. Eiden also testified that Patrick could not rely on the financial records produced by defendants in this case because defendants have continued to re-write those records since their production. See Stewart Aff. Exh. D (Eiden Depo.), p. 22. In addition, Eiden described LMA's financial records as similar to trying to put a puzzle back together and that there were so many things missing that he had given up. See Stewart Aff. Exh. D (Eiden Depo.), p. 13-14, 35-36; see also Stewart Aff. Exh. H (Expert Report). Since no tax returns were prepared for LMA after 1998 for "lack of financial information," LMA is subject to tax penalties for its failure to keep accurate records and pay payroll taxes. See Stewart Aff. Exhs. B (Christopher Depo.), p. 43; D (Eiden Depo.), p. 42.

On April 16, 2001, Flagship Living Trust, on behalf of Patrick, filed the instant lawsuit. On July 13, 2001, a Verified Amended Complaint was served and filed, asserting the following sixteen causes of action: (1) usurpation of corporate opportunities; (2) usurpation of corporate opportunities (on behalf of LMA); (3) breach of contract; (4) breach of fiduciary duty; (5) dissolution/buyout; (6) breach of duty of loyalty; (7) breach of duty of loyalty (on behalf of LMA); (8) tortious interference; (9) tortious interference (on behalf of LMA); (10) misappropriation of confidential information and trade secrets (on behalf of LMA); (11) conflicts of interest (on behalf of LMA); (12) injunctive relief and appointment of a receiver (on behalf of LMA); (13) conversion; (14) conversion (on behalf of LMA); (15) promissory estoppel; and (16) dissenter's rights. The crux of Patrick's claims is that Christopher has been operating LMA for his personal benefit, and without regard to Patrick's rights as a minority shareholder, that Christopher transferred LMA's ISO business to Frontline, a corporation owned solely by Christopher, and that profits from the ISO business that

should have gone into LMA have been channeled through Frontline and to the personal benefit of Christopher and Reavis.

## III. DISCUSSION

On December 3, 2003 defendants filed the instant motion seeking summary judgment and sanctions against Patrick "based on evidence that Patrick Kittler fabricated a document, produced it to defendants and then perjured himself to support his claims based on breach of contract." Defs' Mem., p. 1. In addition, defendants also sought summary judgment as a matter of law on each of Patrick's sixteen claims, asserting that he has failed to produce evidence to create an issue of material fact on any of these claims.

In support of the motion for summary judgment, defendants presented the following arguments: (1) Patrick's entire case should be dismissed as a sanction for his fraud on the Court; (2) summary judgment should be granted as to Patrick's claim for breach of contract since there is no issue of material fact as to the validity of the 1995 contract; (3) Patrick's direct claims (i.e., those claims on behalf of Patrick as an individual shareholder)[11] should be dismissed because the only basis for such claims is the invalid 1995 contract; and (4) Patrick's derivative claims (i.e., those claims on behalf of LMA as a corporation)[12] should be dismissed because Patrick has not

---

[11] The direct claims are as follows: Usurpation of Corporate Benefits; Breach of Fiduciary Duty; Dissolution/Buyout; Breach of Duty of Loyalty; Tortious Interference; Conversion; Promissory Estoppel; and Dissenter's Rights.

[12] The derivative claims are as follows: Usurpation of Corporate Benefits; Breach of Duty of Loyalty; Tortious Interference; Misappropriation of Confidential Information and Trade Secrets; Conflicts of Interest; Injunctive Relief and Appointment of Receiver; and Conversion.

produced sufficient evidence to support the elements of these claims to create an issue of material fact. In addition, defendants contended that Flagship has no standing to assert any derivative claims on behalf of LMA, and on that alternate basis the derivative claims should be dismissed.

In opposition to defendants' motion, Patrick' argued that summary judgment is not appropriate because there are disputes of material facts regarding all of the claims in this case. In this regard, Patrick asserted that summary judgment is not appropriate on the issue central to this case – that is, "whether defendants abided by their contractual obligations and respected the rights of a minority shareholder" – because there are disputed issues of material fact as the 1995 contract. Pls' Mem., p. 2. In addition, Patrick asserted that defendants' motion overlooked the substantial evidence of defendants' own wrongdoing that supports all of his claims.

Further, as to defendants' request for sanctions, Patrick argued that the appropriateness of sanctions is not ripe for decision and that, in any event, sanctions against Patrick are not proper since defendants' handwriting expert's opinion is not conclusive as to whether the contract is, in fact, a forgery and Patrick has denied placing Christopher's signature on the 1995 contract. In addition, in support of the 1995 contract's authenticity, Patrick stated that Christopher has a history of falsely claiming that his signature has been forged on documents related to the genuine business obligations of LMA, citing Christopher's deposition testimony that Reavis had placed Christopher's signature on checks for LMA expenses without permission while admitting that some of the checks were for genuine expenses of LMA. See Stewart Aff. Exh. B (Christopher Depo.), p. 11-25.

In their reply, defendants asserted that Patrick has failed to raise an issue of material fact as to the authenticity of the 1995 written Agreement, that Patrick can only proceed on that contract (and not the oral contract presented by Christopher) because that is the only one alleged in his Complaint, and that no reasonable fact-finder could conclude that the 1995 written Agreement is genuine. As such, defendants stated that all of the claims premised on the 1995 written Agreement must be dismissed. In addition, as to their request for sanctions, defendants asserted that the issue was ripe for decision and that sanctions were proper, regardless of who actually forged Christopher's signature, because Patrick knowingly submitted a manufactured document to the Court.[13]

**A. Motion for Summary Judgment on All Claims Based on Fraud on the Court**

Defendants have requested that this Court dismiss all of Patrick's claims as a sanction for his fraud upon this Court. Specifically, defendants point to the following evidence that the 1995 written Agreement is not genuine and that Patrick committed a fraud on the Court:

- Patrick, both in the Verified Amended Complaint and in his June 28, 2001 Declaration, claimed that he and Christopher initially owned equal shares of LMA and that he was an original officer of LMA, however, Patrick later admitted that he did not have an ownership interest in LMA when it was

[13] Defendants also argued that Patrick's responsive brief should not be considered at all by the Court because it was untimely filed. Patrick's response was due March 8, 2004 and defendants' counsel stated that he was not served until mid-morning March 9, 2004. However, Patrick's counsel represented at the hearing that service of the response was attempted on March 8, 2004, but that defendants' counsel's office was closed when the process server arrived so that service was not effectuated until the next morning. In light of plaintiffs' attempt to serve the response on March 8, 2004, and lack of prejudice to defendants for the delayed service, this Court rejects defendants' argument that plaintiffs' response should be disregarded. Accordingly, the Court has considered plaintiffs' response memorandum.

incorporated and the corporate records showed that he was not an original officer of the company. See Braaten Aff. Exh. P. (Patrick's Depo.) at p. 115-16.

- Patrick has not designated an expert to rebut defendants' handwriting expert who opined that Christopher's signature on the 1995 contract was copied from a pre-existing document.
- Patrick has not produced the original 1995 agreement.
- There is no evidence that Patrick ever owned 50% of LMA.
- The only evidence supporting the validity of the 1995 contract is Patrick's own testimony, which is not sufficient to survive summary judgment.

On the other hand, Patrick asserted that there is substantial evidence to support the validity of the 1995 contract. Specifically, he claimed that he and Christopher entered into the 1995 written Agreement and the performance of the terms of the 1995 written Agreement up until Patrick filed suit indicates that there was an agreement under such terms. Further, Patrick argued that defendants have admitted that Patrick received share certificates for 30% of the company in 1995, and that LMA resources were used to start an ISO business, Frontline, as contemplated by the terms of the 1995 written Agreement. In addition, as to defendants' arguments that Christopher's signature on the 1995 written contract was a forgery, Patrick asserted that Christopher has a history of claiming his signature was forged, and that, in any event, defendants' expert only concluded that it was "highly probable" that the signature was a reproduction from an early document, not that it was such a reproduction. Finally, as to defendants' contention that only Patrick's testimony supports the validity of the 1995 written agreement, Patrick pointed to the declaration submitted by the brothers' father, J. Patrick Kittler, that supports Patrick's version of the agreement.

Under the Federal Rules of Civil Procedure, courts have the authority to impose sanctions, including dismissing the case, for fraud on the Court or dishonest conduct during litigation. FED. R. CIV. P. 41(b); Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991). Nevertheless, taking the facts and inferences in favor of Patrick, the Court finds that there is an issue of material fact as to the validity of the 1995 written Agreement and, as such, as to whether there has been any fraud committed upon this Court. In this regard, defendants have presented Christopher's testimony that the never agreed to or signed the 1995 written Agreement, and the affidavit of a handwriting expert who concluded that it is "highly probable" that Christopher's signature on the 1995 contract and his signature on another document were either created from a common model or one was the model for the other. See Defs. Exhs., Runyon Aff. Exh. A. In addition, defendants have presented testimony from LMA's former attorney, Frank Bennett, who Patrick testified had possession of and was involved in the review of the original 1995 written Agreement, that he had no recollection of involvement in the creation or possession of such an agreement.

On the other hand, Patrick has presented evidence supporting the existence of the 1995 written Agreement. Patrick's father has stated that in 1991 he gifted his 50% interest in LMA to Patrick and that in 1995, that the brothers informed him that they had reached an agreement in which Patrick would own 30% of the company and that stock certificates had been issued to Patrick, that Patrick and his mother would receive financial support, and that Patrick would receive health insurance and other compensation. In August 1995, Patrick was issued a share certificate for 214 shares of

LMA, distributions were paid to Patrick and payments were made to Patrick's mother until this lawsuit was filed in 2001; and the ISO business was developed.

This is precisely the type of material factual dispute that should not be resolved on summary judgment, but rather should be submitted to the jury for resolution. Given the evidence presented by both sides, the Court cannot conclude as a matter of law that the 1995 written Agreement does or does not exist, or is, or is not, valid. Consequently, this Court cannot conclude as a matter of law that Patrick committed a fraud on the Court when he presented the 1995 written Agreement to the Court in support of his breach of contract claim and other claims.

Therefore, defendants' Motion for Summary Judgment should be denied as it relates to defendants' request for summary judgment and sanctions based on fraud on the Court.

**B. Defendants' Motion for Summary Judgment Based Against Flagship Based on Standing**

Defendants have requested that this Court dismiss all of Flagship's derivative claims of (usurpation of corporate opportunities, breach of contract, breach of fiduciary duty, dissolution/buyout, breach of duty of loyalty, tortious interference, misappropriation of confidential information, and promissory estoppel) on grounds that the conduct that supports these claims pre-date the transfer of Patrick's shares to Flagship on December 31, 1999 and, therefore, Flagship has no standing to assert these claims. Specifically, defendants asserted that to have standing in a shareholder lawsuit, the shareholder must have held an interest in the corporation at the time of the alleged wrongdoing, and here, Frontline was incorporated in October 1988. Therefore, since

most of the wrongs alleged in this case occurred before December 31, 1999, the date the shares were transferred to Flagship, defendants contend it does not have standing to assert such claims and they should be dismissed.

In opposition, Patrick argued that defendants' motion has no merit because there has never been a change in the beneficial ownership of the stock – Patrick was and remains the beneficial owner. In addition, Patrick asserted that, although some of the wrongdoing in this case occurred before December 31, 1999, much also occurred after this date.

Under Minnesota law, "a person shall be deemed the beneficial owner of shares and securities beneficially owned by any relative or spouse of the person or any relative of the spouse, residing in the home of the person, [or] any trust or estate in which the person owns ten percent or more of the total beneficial interest." Minn. Stat. § 302A.011. In addition, beneficiary owners have standing to pursue pre-existing derivative claims. See Anderson v. Anderson, 293 Minn. 209, 219 (1972).

The Court concludes that Patrick's creation of the living trust did not change the beneficial ownership of the LMA shares, and therefore, standing is not a bar to Patrick's claims in this case. Accordingly, defendants' Motion for Summary Judgment should be denied as it relates to defendants' request for summary judgment based on Flagship's lack of standing to assert derivative claims in this suit.

### C. Defendants' Motion for Summary Judgment on Breach of Contract Claim

Defendants argued that summary judgment should be granted on Count Three of the Amended Complaint, the breach of contract claim, because Patrick has not presented facts to establish the existence or validity of the 1995 written Agreement, and

particularly, in light of the overwhelming evidence that the contract is a forgery. For all the reasons discussed in Section III.A supra, the Court concludes that, there is a material factual dispute as to the existence and validity of the 1995 written Agreement, and summary judgment on this claim should be denied.[14]

**D. Defendants' Motion for Summary Judgment On Plaintiff's Remaining Claims**

Patrick has alleged the following additional claims against defendants: (1) Usurpation of Corporate Benefits, on behalf of Patrick Kittler, as a shareholder of LMA, and derivatively on behalf of LMA; (2) Breach of Fiduciary Duty, on behalf of Patrick Kittler, as a shareholder of LMA; (3) Dissolution/Buyout, on behalf of Patrick Kittler, as a shareholder of LMA; (4) Breach of Duty of Loyalty, on behalf of Patrick Kittler, as a shareholder of LMA, and derivatively on behalf of LMA; (5) Tortious Interference, on behalf of Patrick Kittler, as a shareholder of LMA, and derivatively on behalf of LMA; (6) Misappropriation of Confidential Information and Trade Secrets, derivatively on behalf of LMA; (7) Conflicts of Interest, derivatively on behalf of LMA; (8) Injunctive Relief and Appointment of Receiver, derivatively on behalf of LMA; (9) Conversion, on behalf of Patrick Kittler, as a shareholder of LMA, and derivatively on

[14] Patrick brought direct claims and derivative claims on behalf of LMA. As such, the direct claims assert rights as a shareholder of LMA and the derivative claims assert the rights of LMA the corporation. Defendants argued that, since summary judgment should be granted on the breach of contract claim, all of Patrick's direct claims must fail because there is no valid contract conferring ownership in LMA to Patrick and, consequently, Patrick has no basis to assert such claims. However, the Court rejects defendants' "global" argument since summary judgment is not recommended as to the breach of contract claim. Further, even if Patrick's breach of contract claim failed based on the 1995 written Agreement, according to defendants' own version of the facts, Patrick ended up with 30% ownership of LMA and, as a consequence, would have the right to assert direct claims at that time against defendants as a shareholder of LMA.

behalf of LMA; (10) Promissory Estoppel, on behalf of Patrick Kittler, as a shareholder of LMA; and (11) Dissenter's Rights, on behalf of Patrick Kittler, as a shareholder of LMA.

The Court will now address defendants' request for summary judgment as a matter of law on each of these claims.

**1. Usurpation of Corporate Benefits on Behalf of Patrick and LMA**

Counts One and Two of the Amended Complaint allege direct and derivative usurpation of corporate opportunity claims. In this regard, Patrick alleged that "[t]he business plan developed by Patrick and Christopher Kittler for LMA was that it would be an ISO, and LMA's other products gave it an advantage over competitors in the ISO business. Christopher Kittler usurped that competitive advantage and took the corporate opportunity of an ISO for his own personal benefit." Defs' Exhs, Braaten Aff. Exh. A (Amended Complaint), ¶ 29.

The elements of a claim for usurpation of corporate benefits are: (1) a corporate opportunity belonging to a corporation, that is, an opportunity that the corporation might easily expand into and has the financial ability to pursue; and (2) the officer or director violated their fiduciary duty in acquiring this opportunity. Miller v. Miller, 301 Minn. 207, 219 (Minn. 1974).

Defendants asserted that summary judgment should be granted as to these corporate usurpation claims because there is no evidence to support the required elements for such claims. In this regard, defendants asserted that as a threshold issue, the claims must fail because LMA did not have the financial ability to become an ISO and it was not possible for LMA to become an ISO. Additionally, defendants argued

that, even if the opportunity had belonged to LMA, a claim for usurpation would still fail because there was no breach of fiduciary duty by Christopher and because Patrick ratified Christopher's creation of Frontline.

In support of these arguments, defendants cited to the following facts:

- Patrick's testimony that he had no idea whether it was feasible for LMA to ever become an ISO.
- Patrick's testimony that when LMA began doing business it could not be an ISO at that time.
- Patrick's testimony that that when he left LMA in 1995, it still was not possible for LMA to become an ISO.
- Christopher's testimony that after Utica, one of LMA's insurers, refused to cover a merchant loss and sent cancellation notices to LMA's customers, LMA's reputation suffered and LMA could no longer operate successfully.
- Christopher's testimony that he had discovered under VISA and MasterCard bylaws that it would have been a conflict for LMA to become an ISO while it was an insurer.
- Reavis' testimony that "I believe there were issues with insurance agencies owning ISO's or insurance carriers getting involved with ISO's. There were some perceived regulatory issues with ISO's that prohibited LMA from direct ownership."

See Defs' Exhs., Braaten Aff. Exhs. P (Patrick's Depo.), p. 185-86, 188-90; Q (Christopher's Depo), p.10, 59-60; Stewart Aff. Exh. C (Reavis Depo.), p. 35-36.

In opposition to the motion on this claim, Patrick presented the following facts in support of the elements of these claims. First, Frontline's ISO business was established and operated by LMA employees, in LMA's offices, using LMA's money and assets and that LMA. In this regard, Reavis testified that Frontline and LMA were operated as a single entity and Christopher testified that Frontline was processing over $5 million in

business, per month, before having a single employee or even an office. See Stewart Aff. Exh. B (Christopher Depo.), p. 124-27, 137.

Second, even after Frontline hired employees, both LMA and Frontline were run by the same people from the same location. See Stewart Aff. Exh. C (Reavis Depo.), p. 44-47.

Third, Christopher testified during his deposition that he stopped soliciting clients and business for LMA around the time of the Utica litigation and the beginning of Frontline's ISO business. See Defs. Exhs, Braaten Aff. Exh. Q (Christopher Depo.), p. 51-53.

Fourth, Patrick testified that he was unsure if LMA could become an ISO because LMA had not proven to the industry that it could insure losses, not that it could by law, not become an ISO. See Defs Exhs, Braaten Aff. Exh. P (Patrick Depo.), p. 189-90.

Finally, Patrick testified that he did not object to the formation of Frontline because he thought his ownership interest in LMA translated into an ownership interest in Frontline.[15]

The Court concludes that there is a genuine issue of material fact as to each of the elements of the corporate usurpation claims. First, there is an issue of material fact as to whether the opportunity to develop an ISO business was an opportunity that LMA could expand into and had the financial ability to pursue. Specifically, while facts were

[15] Patrick cited to page 171-72 of his deposition for this assertion. See Pls' Mem., p. 15. However, the Court did not find this information on page 171-72 of the transcript excerpts provided to the Court of Patrick's deposition. See Stewart Aff. Exh. A (Patrick Depo.), p. 171-72.

presented by defendants to the Court to suggest that LMA could not have housed an ISO operation under its own roof, there is nothing to suggest that it could not have ceased its operations as an insurer, or created an independent company (subsidiary, affiliate, or otherwise) to resolve the potential conflict of acting as an insurer and ISO at the same time. In addition, facts were presented to the Court showing that LMA had the financial wherewithal to pursue the ISO opportunity – LMA's employees, assets, capital, and customers were used to develop Frontline's ISO business and without compensation to LMA. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 132-33, 138-40; C (Reavis Depo.), p. 34-36, 41, 45-49, 59-60, 77, 82, 86-87; E (Newberg Depo.), p. 16; see also J. Patrick Decl. ¶ 12. If LMA's assets were used to develop Frontline's ISO business, it follows that LMA's assets could also have been used to develop LMA's own ISO business.

Second, there is an issue of material fact as to whether Christopher violated his fiduciary duties, as an officer of the LMA, in taking the ISO business opportunity for Frontline, the company he formed for himself. Specifically, Patrick has presented evidence that Christopher was the majority shareholder and CEO of both LMA and Frontline during the time that LMA's assets and employees were being used to start Frontline, and that it was Christopher who had LMA write a check to Frontline for $350,000 in March 1999. In addition, Christopher was the majority shareholder and CEO of both LMA and Frontline when LMA's assets were transferred to Frontline (including client information), LMA's employees were transferred to Frontline, and LMA's employees did all the work to set-up Frontline's business. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-

60, 77, 82, 86-87; E (Newberg Depo.), p. 16; see also J. Patrick Decl. ¶ 12. Given that these transfers happened when Christopher led both companies, it is reasonable to infer that Christopher breached his fiduciary duties, i.e., these actions occurred with Christopher's knowledge and consent.

In addition, Reavis testified that, when work began to set up Frontline, LMA's employees stopped working for the benefit of LMA and LMA's business was essentially halted. See Stewart Aff. Exh. C (Reavis Depo.), p. 44-45, 91-92. Further, the re-characterization of the $350,000 contribution to Frontline in 1999 from an expense of LMA to a loan to Christopher is further evidence of Christopher's violation of his duties to LMA and attempt to cover it up. See Stewart Aff. Exh. D (Eiden Depo.), p. 5-13, 22-25.

Therefore, there are genuine issues of material fact as to the corporate usurpation claims. Summary judgment is not appropriate and defendants' Motion for Summary Judgment should be denied as it relates to these claims.

**2. Breach of Fiduciary Duty and Breach of Duty of Loyalty on Behalf of Patrick and LMA**

In Counts Four, Six, and Seven of the Verified Amended Complaint, Patrick alleged that Christopher violated his fiduciary duties to Patrick and his duties of loyalty to both Patrick and LMA. Specifically, Patrick asserted that Christopher owed Patrick fiduciary duties as a shareholder of a closely held corporation, such as "to be treated in an honest, fair and reasonable manner in the operation of LMA," a duty of loyalty as a shareholder of LMA, and a duty of loyalty to LMA. Defs' Exhs, Braaten Aff. Exh. A (Amended Complaint), ¶¶ 44-45, 60-61, 66-67.

Under Minnesota law, officers and directors must discharge their duties in good faith, in the manner in which they reasonably believe to be in the best interest of the corporation and with the care that an ordinary prudent person in a similar position would exercise under similar circumstances. See Minn. Stat. § 302A.251.

In support of their motion for summary judgment on this claim, defendants asserted that, to the extent it is premised on the Patrick's assertion that Christopher breached his contractual and fiduciary duties to him by "misusing the proprietary products and information of LMA to establish a competing business," that claim is preempted by Patrick's claims under the Minnesota Uniform Trade Secret Act ("MUTSA"), Minn. Stat. § 325C. 01 et seq., for which Patrick has not produced evidence sufficient to create a genuine issue of fact as to whether defendants violated MUTSA. See Section II.D.1 infra.[16] Additionally, defendants argued that, to the extent that

[16] Defendants assert that Minn. Stat. § 325C.07 establishes that MUTSA preempts Patrick's claims relating to Christopher's misappropriation of trade secrets. Minn. Stat. § 325C.07, entitled "effect on other law," provides as follows: "Except as provided in paragraph (b), sections 325C.01 to 325C.07 displace conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Minn. Stat. § 325C.07(a). Section (b) states that "[s]ections 325C.01 to 325C.07 do not affect: "(1) contractual remedies, whether or not based upon misappropriation of a trade secret; (2) other civil remedies that are not based upon misappropriation of a trade secret; or (3) criminal remedies, whether or not based upon misappropriation of a trade secret." Minn. Stat. § 325C.07(b). In essence, defendants are contending that Patrick cannot maintain claims under both statutes at the same time. Patrick did not address this argument in his responsive brief. To the extent that Patrick's derivative breach of duty of loyalty claim (Count Seven) is based on the contention that Christopher took information governed by MUTSA, the Court agrees that the claim is preempted by Count Ten, the misappropriation of confidential information and trade secrets claim on behalf of LMA. However, to the extent that Count Seven seeks to address other proprietary products and information allegedly taken by Christopher, Count Seven is not preempted by Count Ten. Further, Count Ten, which is a claim on behalf of LMA, does not preempt Counts Four or Six, which are direct claims on behalf of Patrick.

Patrick's claim is based on allegations that Christopher mismanaged LMA, there is no evidence to support the claim. Defendants also argued that summary judgment should be granted on these claims for if summary judgment is granted on Patrick claims of misappropriation, usurpation, and conversion.

In response, Patrick stated that directors may be personally liable to corporations and its shareholders for any breach of a director's duty of loyalty and any transaction in which a director has derived an improper personal benefit. Patrick then argued that this is what happened here: Christopher misappropriated cash and other assets belonging to LMA and then abandoned LMA's business when it was in his personal interest to do so.

In support of his argument that there is substantial evidence supporting the claim that Christopher breached his fiduciary duties and duties of loyalty as an officer and director or LMA, Patrick presented evidence showing that Christopher failed to pay LMA's taxes or file its tax returns from 1998 to 2002, failed to keep adequate books and financial records for LMA, used employees paid by LMA to start Frontline, used money from LMA to provide the capital necessary to start Frontline, and abandoned the business of LMA once Frontline had been started because Frontline was more profitable for Christopher. See Stewart Aff. Exhs. B (Christopher Depo.), p. 42-43; C (Reavis Depo.), p. 44-45, 91-92.

Based upon the record presently before this Court, the Court finds that there is a genuine issue of material fact as to these claims. Specifically, there are several factual issues regarding the propriety of Christopher's actions, specifically Christopher's actions in starting Frontline's business using LMA's funds, assets, and employees, without

compensation to LMA, and the efforts of to hide this by re-characterizing these expenses. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-60, 77, 82, 86-87; D (Eiden Depo.), p. 5-13, 22-25; E (Newberg Depo.), p. 16; see also J. Patrick Decl. ¶ 12. Moreover, there is evidence that Christopher ignored LMA's business once Frontline was established and that proper records were not maintained for LMA. See Stewart Aff. Exhs. B (Christopher Depo.), p. 42-43; C (Reavis Depo.), p. 44-45, 91-92. In light of these disputed facts, defendants' Motion for Summary Judgment should be denied as it relates to the breach of fiduciary duty and duty of loyalty claims.

**3. Dissolution/Buyout on Behalf of Patrick**

In Count Five of the Verified Amended Complaint, Patrick alleged that Christopher is a "directors and/or in control of LMA [and has] acted fraudulently and/or in a manner unfairly prejudicial toward plaintiff Patrick Kittler. In his capacity as a shareholder of LMA." Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶¶ 52-53. In this regard, Patrick asserted that Christopher "violated [his] duty to act in an honest, fair and reasonable manner in the operation of LMA," Christopher "acted contrary to the reasonable expectations of all shareholders . . . evidenced by, among other things, the June 27, 1995 agreement between plaintiff Patrick Kittler and defendant Christopher Kittler," and the "corporate assets of LMA have been and are being misapplied and/or wasted." Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶¶ 55-57.

Under Minn. Stat. § 302A.751, a court may grant equitable relief it deems just and reasonable under the circumstances of a case, including dissolving a corporation and liquidating its assets and business.

Defendants argued that dissolution of Frontline cannot be ordered because neither Flagship nor Patrick are shareholders of Frontline and, consequently, they have no standing to request the dissolution or buyout of their nonexistent shares. In addition, defendants argued that a buyout of LMA cannot be ordered because there is insufficient evidence to create an issue of material fact as to whether Christopher violated his duty to act reasonably in the operation of LMA, whether any of LMA's assets were misapplied or wasted, or whether Christopher acted contrary to Patrick's reasonable expectations.

In contrast, Patrick argued that clearly there is a factual dispute as to whether Christopher treated LMA and him, as its minority shareholder, fairly. In support of this position, Patrick presented evidence that LMA employees and funds were used to start Frontline, that Christopher failed to keep adequate records and file tax returns for LMA, and that Christopher has attempted to re-characterize transactions retroactively after the instant case was filed. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-60, 77, 82, 86-87; D (Eiden Depo.), p. 5-13, 22-25; E (Newberg Depo.), p. 16. With respect to defendants' argument that Patrick has no standing to seek a remedial relief against Frontline under Minn. Stat. § 302A.751, Patrick contended that he has presented evidence that he owns an interest in Frontline based on the evidence that Frontline was paid for by LMA. Thus, Patrick argued that the issue of whether the dissolution or buyout of Frontline is appropriate must await resolution of the disputed factual issue of who owns Frontline.

The Court finds that there are material fact disputes as to this claim. As argued by Patrick, there are factual disputes as to whether Christopher treated Patrick, its

minority shareholder, fairly in the use of LMA's employees and assets in setting up Frontline, without compensation, and Christopher's actions of re-characterizing his transactions. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-60, 77, 82, 86-87; D (Eiden Depo.), p. 5-13, 22-25; E (Newberg Depo.), p. 16; see also J. Patrick Decl. ¶ 12. As such, there are factual disputes as to who owns Frontline, in light of the evidence presented that LMA's assets were used to create Frontline. Further, there is evidence before this Court that Christopher disregarded LMA's business once Frontline was established and that the proper records were not maintained for LMA, in violation of duties he owed to Christopher, as a minority shareholder. See Stewart Aff. Exhs. B (Christopher Depo.), p. 42-43; C (Reavis Depo.), p. 44-45, 91-92.

Accordingly, defendants' Motion for Summary Judgment [Docket No. 106] should be denied as it relates to the dissolution/buyout claim.

**4. Tortious Interference on Behalf of Patrick and LMA**

In Count Eight of the Verified Amended Complaint, Patrick alleged that he and Christopher had a valid contract, that Frontline had knowledge of this contract, and that, without justification, Frontline "intentionally procured the breach" of this contract. Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶¶ 73-76. On behalf of LMA, in Count Nine of the Verified Amended Complaint, Patrick asserted that "Reavis and other LMA employees had and have valid noncompetition agreements with defendant LMA," that Frontline and Christopher had knowledge of such agreements, and that Frontline and Christopher, without justification, intentionally procured the breach of these agreements. Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶¶ 80-84.

The elements of a claim for tortious interference are: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional interference with such contract; (4) without justification; and (5) resulting damages. See Kallok v. Medtronic, Inc., 563 N.W.2d 356, 362 (Minn. 1998); Oak Park Dev. Co. v. Snyder Bros. Of Minnesota, Inc., 499 N.W.2d 500, 506 (Minn. Ct. App. 1993) (citations omitted);

As to Patrick's claim that Frontline interfered with the 1995 written Agreement between Patrick and Christopher, defendants asserted that summary judgment should be granted on this claim because the evidence does not establish the existence of any contract between Christopher and Patrick. Further, defendants argued that even if there were such a contract, there is no evidence that Frontline interfered with or intentionally procured its breach. In support of this argument, defendants stated that there was nothing in the alleged contract between Christopher and Patrick that prevented Christopher from forming Frontline and there is no evidence that Frontline did anything to procure a breach of any of the terms of the alleged agreement.

As to Patrick's derivative shareholder claim that Frontline and Christopher procured the breach of LMA's non-compete agreements with its employees, defendants asserted that the existence of non-compete contracts was questionable for employees other than Reavis, the Verified Amended Complaint does not mention how Frontline and Christopher allegedly interfered with any non-compete agreements, and Patrick has not shown that he has suffered any damages from the alleged interference. To the contrary, defendants asserted that Patrick testified that LMA did not compete with ISO's.

In response to defendants' motion as it related to his claim that Frontline interfered with his contract with Christopher, Patrick argued that the evidence

established the existence of the 1995 written Agreement between Patrick and Christopher, Christopher owned and operated Frontline, and therefore, Frontline had knowledge of the parties' agreement and interfered with its performance by taking Patrick's 30% share of the ISO business. Consequently, Patrick argued that he has suffered damages from this interference, i.e., the loss of his share of the ISO business.

With respect to Patrick's derivative claim that Christopher and Frontline interfered with LMA's contracts with its employees, Patrick asserted that summary judgment should not be granted on this Count because the evidence showed that all of LMA's employees were transferred from LMA to Frontline in 1999 and 2000, without any compensation to LMA. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-60, 77, 82, 86-87. In this regard, Patrick asserted that the evidence showed that LMA's employees' employment contracts were cancelled and replaced with employment agreements with Frontline, and that by transferring LMA's employees to Frontline, Frontline procured the breach of the terms of LMA's employment contracts with these employees, which barred them from working for competitors.[17] See Stewart Aff. Exhs. B (Christopher Depo.), p. 121-22; C (Reavis Depo.), p. 44-45.

---

[17] In this regard, Patrick presented evidence that Eric Odegaard, a former employee of LMA, resigned his employment with LMA in 1998 to work for an ISO and that LMA then sued Odegaard for breach of his employment contract with LMA. See Stewart Aff. Exh. B (Christopher Depo., Exh. 8), p. 103-08. In support of LMA's motion for a TRO in this suit, Christopher submitted a Declaration in which he stated that Odegaard had breached his employment contract with LMA by working for an ISO competitor of LMA, and by taking the knowledge and work related to developing an ISO business from LMA with him. Id. Patrick also presented evidence that Reavis' employment contract with LMA had included covenants protecting LMA's business. See Stewart Aff. Exh. C (Reavis Depo., Exh. 10), p. 43-44.

The Court finds that summary judgment should not be granted on the tortious interference claims because there are material factual disputes as to these elements of these claims. First, to the extent the Patrick's claims are based on the 1995 written Agreement between Christopher and Patrick, as previously discussed, there are factual disputes. In addition, there are factual disputes as to whether Frontline interfered with this contract by developing the ISO business for itself and taking Patrick's alleged share of the business. Further there is a dispute as to whether, and to what extent, Patrick was damaged by the procurement of the breach of the parties' 1995 written Agreement. As such, summary judgment is not appropriate on this claim.

Second, to the extent the claims are based on the transfer of all of LMA's employees to Frontline in 1999 and 2000, without any compensation to LMA, there are factual disputes on Patrick Kittler's derivative claim of tortious interference with these employment relationships and contracts. As discussed above, there is a dispute as to the propriety of the transfer of LMA's employees to Frontline and the events leading to this transfer. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-60, 77, 82, 86-87.

Therefore, defendants' Motion for Summary Judgment should be denied as it relates to the tortious interference claims.

**5. Misappropriation of Confidential Information and Trade Secrets on Behalf of LMA**

In Count Ten of the Verified Amended Complaint, Patrick alleged that Frontline, and Christopher "have misused and revealed LMA's confidential and trade secret

information" to the damage of LMA, in violation of MUTSA and common law. Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶¶ 88-89.

Under Minn. Stat. § 325C.01, misappropriation is the:

> (i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or (ii) disclosure or use of a trade secret of another without express or implied consent by a person who
>
> > (A) used improper means to acquire knowledge of the trade secret; or
> >
> > (B) at the time of disclosure or use, knew or had reason to know that the discloser's or user's knowledge of the trade secret was
> >
> > > (I) derived from or through a person who had utilized improper means to acquire it;
> > >
> > > (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > >
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> >
> > (C) before a material change of the discloser's or user's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Minn. Stat. § 325C.01, subd. 3.

In other words, to succeed in a misappropriation of confidential information and trade secrets claim, a plaintiff must establish the following: (1) that the information was either a trade secret or confidential; (2) that such information was wrongfully acquired or acquired through a confidential relationship; and (3) that the defendant used and

disclosed the information. See Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983).

Defendants argued that summary judgment should be granted on this claim because there is no evidence that Frontline or Christopher used or disclosed any trade secret or confidential information or that LMA suffered any damages as a result and plaintiffs have not identified any such information. Moreover, to the extent that Patrick is claiming Christopher took customer lists and contracts to Frontline, defendants asserted that Christopher did not testify that Frontline relied on LMA's customer lists and contracts to get its business going, rather, he merely acknowledged that some of Frontline's customers were also customers of LMA. Further, defendants asserted that it is undisputed that LMA and Frontline were not competitors and, since they were not competitors, LMA was not damaged by Frontline's solicitation of its customers for a different service.

In opposition to this contention, Patrick presented Christopher's affidavit in the Odegarrd case, that both described LMA's proprietary information and detailed the steps taken by LMA to protect it and the uses of such information by the ISO it considered to be LMA's competitor. See Stewart Aff. Exh. B (Christopher Depo., Exh. 8 ¶¶ 6-7); see also Stewart Aff. Exh. C (Reavis Depo.), p. 33, 42-45. Moreover, Christopher and Reavis both testified that Frontline used LMA's customer lists and contacts to get its business started and LMA's accountant testified that Frontline took intellectual property from LMA without compensating LMA. See Stewart Aff. Exhs. B (Christopher Depo.), p. 131-33; C (Reavis Depo.), p. 41; E (Newberg Depo.), p. 14-16.

The Court concludes that there is a factual dispute as to Patrick's misappropriation claim. Here, Patrick has submitted evidence supporting his assertion that LMA's customer lists and client information are confidential information and that Christopher and Frontline were knew that the information was considered confidential by LMA. See Stewart Aff. Exhs. B (Christopher Depo., Exh. 8, ¶¶ 6-7); C (Reavis Depo.), p. 42-45. In addition, Patrick has presented evidence that Frontline used LMA's customer lists and contacts in starting its business, without compensating LMA. See Stewart Aff. Exhs. B (Christopher Depo.), p. 131-33; C (Reavis Depo.), p. 41; E (Newberg Depo.), p. 14-16. Accordingly, there is a factual dispute as to whether defendants misappropriated confidential information from LMA and, as such, summary judgment should not be granted.

Therefore, defendants' Motion for Summary Judgment should be denied as it relates to the misappropriation claim.

**6. Conflicts of Interest on Behalf of LMA**

In Count Eleven of the Verified Amended Complaint, Patrick alleged that Christopher "had material financial interests in defendant Frontline that conflicted with his responsibilities as a director of LMA under Minn. Stat. § 302A.255." Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶ 92.

Under Minnesota law, under certain circumstances, a contract or transaction between a corporation and an organization, in or of which the corporation's directors are also directors, officers, legal representatives, or have a material financial interest in, is not void or voidable. In this regard, Minn. Stat. § 302A.255 provides, in pertinent part:

> Subdivision 1. Conflict; procedure when conflict arises. A contract or other transaction between a corporation and one or more of its directors, or between a corporation and an organization in or of which one or more of its directors are directors, officers, or legal representatives or have a material financial interest, is not void or voidable because the director or directors or the other organizations are parties or because the director or directors are present at the meeting of the shareholders or the board or a committee at which the contract or transaction is authorized, approved, or ratified, if:
>
> (a) The contract or transaction was, and the person asserting the validity of the contract or transaction sustains the burden of establishing that the contract or transaction was, fair and reasonable as to the corporation at the time it was authorized, approved, or ratified; [or]
>
> (b) The material facts as to the contract or transaction and as to the director's or directors' interest are fully disclosed or known to the holders of all outstanding shares, whether or not entitled to vote, and the contract or transaction is approved in good faith by (1) the holders of two-thirds of the voting power of the shares entitled to vote which are owned by persons other than the interested director or directors, or (2) the unanimous affirmative vote of the holders of all outstanding shares, whether or not entitled to vote.

Thus, based on a plain reading of the statute, if a transaction takes place involving a corporation and one of its directors or officers, and if subsections (a) or (b) are not met, the transaction is void or voidable.

Defendants argued that summary judgment should be granted as to this claim because Patrick has not alleged a specific transaction that could be analyzed under this statute.

In support of this claim, Patrick presented evidence that LMA’s employees, money, and assets were used to establish Frontline, of which Christopher claims to be

the sole owner. In addition, Patrick presented Christopher's testimony that he had to cease LMA's business because he could not continue to run both LMA and Frontline once the ISO was up and running, indicating that even Christopher was aware of the conflict of inherent in managing both LMA and Frontline. See Stewart Aff. Exh. B (Christopher Depo.), p. 56.

Based on the facts presented by both parties, the Court finds that there is a material factual dispute as to this claim. Patrick has presented evidence that Christopher transferred money, employees, assets and customers belonging to LMA to his company Frontline, without the full disclosure to or knowledge of Patrick, who held 30% of the shares of LMA, and without the approval of "(1) the holders of two-thirds of the voting power of the shares entitled to vote which are owned by persons other than the interested director or directors, or (2) the unanimous affirmative vote of the holders of all outstanding shares." See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-60, 77, 82, 86-87; E (Newberg Depo.), p. 16; see also J. Patrick Decl. ¶ 12. In light of the this evidence, there is support for Patrick's assertion that these transactions are void or voidable under Minn. Stat. § 302A.255 since Christopher did not secure the unanimous approval of all shareholders or approval of those shareholders (i.e., Patrick) who did not have an interest in these transactions before they occurred.

Therefore, defendants' Motion for Summary Judgment should be denied as it relates to the conflict of interest claim.

**7. Injunctive Relief and Appointment of Receiver on behalf of LMA**

In Count Twelve of the Verified Amended Complaint, Patrick alleged that Christopher and Frontline "misappropriated assets and monies that belong to LMA and all of its shareholders" and that, "unless restrained by the Court, such assets and monies will be dissipated or transferred." Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶¶ 96-97. As such, Patrick requested, under Minn. Stat. § 302A.751, that the Court appoint a receiver to "take over the assets of LMA and Frontline and to recover all assets acquired by Frontline and Christopher Kittler with monies that should have gone to LMA." Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶ 97.

Defendants asserted that if summary judgment is granted as to Patrick's other claims, this claim is moot and, therefore, summary judgment should be granted as to this claim, as well.

Patrick opposed summary judgment on this claim because defendants have not offered any factual or legal arguments in support of summary judgment, except to say if Patrick's other claims are dismissed, this Count should be dismissed too. Patrick contended that if this case proceeds to trial, a court appointed receiver would be necessary to trial to sort out "to sort out the financial mess that defendants have made of LMA." In this regard, Patrick referred to the testimony of defendants' accountant, Eiden, who said that the records were like putting a puzzle back together. See Stewart Aff. Exh. D (Eiden Depo.), p. 5-14, 35-36. Patrick argued that LMA is entitled to an independent accounting for, and return of, its assets and money.

Minn. Stat. § 302A.751 provides, in pertinent part, that a court may dissolve a corporation and liquidate its assets and business in an action by a shareholder in the

following circumstances. First, if "the directors or those in control of the corporation have acted fraudulently or illegally toward one or more shareholders in their capacities as shareholders or directors, or as officers or employees of a closely held corporation." Second, if "the directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders or directors of a corporation that is not a publicly held corporation, or as officers or employees of a closely held corporation." Third, if "the corporate assets are being misapplied or wasted."

As a preliminary matter, the Court concludes that, since defendants have relied solely on their arguments against Patrick's other claims for their motion, which this Court has rejected, there is no basis in the record to grant summary judgment on this claim. In addition, for all of the reasons articulated by this Court in connection with defendants' motion with respect to the corporate usurpation, breach of fiduciary, breach of the duty of loyalty, and conflict of interest claims, this Court finds that there is a material factual dispute as to the elements of a claim for relief under Minn. Stat. § 302A.751.

Therefore, defendants' Motion for Summary Judgment should be denied as it relates to the injunctive relief and appointment of a receiver claim.

**8. Conversion on Behalf of Patrick and LMA**

In Counts Thirteen and Fourteen of the Verified Amended Complaint, Patrick alleged that defendants have unlawfully converted "assets and monies belong[ing] to plaintiffs" or LMA. Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶¶ 100, 104.

A claim for conversion lies where the defendant exerted control over the plaintiff's property in contravention of the plaintiff's rights. See Davis v. Midwest Discount Sec., Inc., 439 N.W.2d 383, 387 (Minn. Ct. App. 1989).

Defendants asserted that summary judgment should be granted as to these claims because there is no evidence that defendants converted any of Patrick's or LMA's monies or assets.

In opposition, Patrick asserted that summary judgment should not be granted on these claims because there is clear evidence of defendants' conversion of LMA's assets and profits that were either to be distributed to him or used to develop ISO business on behalf of LMA. Specifically, Patrick presented evidence that LMA wrote a $350,000 check to Frontline; Christopher converted assets belonging to LMA for his own use in starting Frontline, the same assets he worried that Odegaard would pass on to an ISO were taken from LMA and given to Frontline without compensation, and, under the terms of 1995 written Agreement, LMA profits were to be distributed to the owners or used to develop an ISO business for the benefit of LMA, and they were not.[18]

The Court finds that, for all the reasons previously discussed, and in light of the evidence presented regarding the use of LMA's funds, assets, and employees to start Frontline and the later efforts to re-characterize these expenses, there are factual

---

[18] Further, Patrick argued that this claim could be brought derivatively on behalf of LMA because conversion of corporate property by officers creates a cause of action on behalf of a minority shareholder under Minn. Stat. § 302A.751. This Court agrees, however, this was claim was not made by defendants, and therefore, it is waived. See U.S. v. $84,615 in U.S. Currency, 2004 WL 1746263, *2 (8th Cir. 2004) (upholding the district court's decision to not reach the merits of an argument, based on the conclusion that the argument had been waived because it had not been raised).

disputes as to whether defendants converted property belonging to LMA and Patrick and LMA. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-60, 77, 82, 86-87; Exh. D (Eiden Depo.), p. 5-13, 22-25; E (Newberg Depo.), p. 14-16; see also J. Patrick Decl. ¶ 12.

As such, defendants' Motion for Summary Judgment should be denied as it relates to the conversion claim.

**9. Promissory Estoppel on Behalf of Flagship Living Trust**

In Count Fifteen of the Verified Amended Complaint, Patrick alleged that Christopher "has made promises to plaintiff Patrick Kittler that must be enforced under the doctrine of promissory estoppel." Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶ 107.

To establish a claim for promissory estoppel, a plaintiff must show the following: (1) a clear and definite promise; (2) that was intended to induce reliance on promise; and (3) that the promise must be enforced to prevent injustice. Signcad Tech. Corp. v. Signcad Sys., Inc., 2003 WL 465801, *4 (D. Minn. 2003); Olson v. Synergistic Techs. Bus. Sys., Inc., 628 N.W.2d 142, 152 (Minn. 2001); Schumacher v. Schumacher, 627 N.W.2d 725, 728 (Minn. Ct. App. 2001).

Defendants asserted that this claim fails because there is no evidence presented of any promise made by to Christopher to Patrick, that Patrick relied on any such promise, that there would be any injustice if such a promise were not enforced, and no evidence that Patrick gave up anything in reliance on such a promise. In support of this position, defendants asserted that the only evidence that Patrick owned 50% of LMA is

the inconsistent testimony of Patrick and the declaration of their father that he gifted his 50% interest in LMA to Patrick.

Plaintiffs argued that summary judgment should not be granted as to this claim because the evidence shows that Patrick and Christopher operated LMA as equal owners before 1995. See Patrick Decl. dated March 8, 2004, p. 2. In addition, Patrick asserted that Patrick and his father[19] have testified that Patrick gave up part of his ownership interest in LMA in reliance on Christopher's promise to continue the pursuit of starting an ISO business. See Patrick Decl. dated March 8, 2004, p. 2-3; J. Patrick Decl. ¶ 7.

The Court concludes that there for this claim to survive, there must be promises separate from those that formed the contract between the parties at issue in this case. See Signcad Tech. Corp., 2003 WL 465801 at *4-5 (questioning the application of promissory estoppel where the parties asserted a written contract containing a condition precedent but also brought a promissory estoppel claim in the alternative, should the contract be deemed unenforceable). However, the only promise regarding the pursuit of the ISO business is the promise that is part of the 1995 written Agreement. Having presented no other specific and separate promises, defendants' Motion for Summary

[19] In this regard, defendants point out that Patrick has never testified receiving any shares as a gift from his father. In addition, defendants asserted that the father's declaration in this regard is inconsistent with his 1999 letter to Christopher demanding an accounting of LMA on his own behalf. See Braaten March 12, 2004 Aff. Exh. 1. Further, defendants asserted that the father's declaration does not state that Patrick gave up some interest in LMA in reliance on Christopher's promise that he would continue to pursue the brothers' dream of building the business into an ISO, but only that Christopher and Patrick had reached an arrangement under which Patrick would own 30% of LMA.

Judgment [Docket No. 106] should be granted as it relates to the promissory estoppel claim.

**10. Dissenter's Rights on Behalf of Flagship Living Trust**

In Count Sixteen of the Verified Amended Complaint, Patrick alleged that "[p]laintiffs are entitled to obtain payment for the fair value of their shares under Minn. Stat. § 302A.471." Defs' Exhs., Braaten Aff. Exh. A (Amended Complaint), ¶ 110.

A shareholder may dissent from a corporate action and obtain payment for the full value of their share of the corporation if "a sale, lease, transfer, or other disposition of all or substantially all of the property and assets of the corporation," occurs not in the usual course of business and without the requisite notice and shareholder approval. See Minn. Stat. § 302A.471, subd. 2.

Defendants argued that summary judgment should be granted on this claim because plaintiffs have not pled the required elements and have presented no evidence to support this claim.

Patrick argued that summary judgment is not warranted because the transfer of LMA's assets to Frontline occurred without the required shareholder notice or approval and, as such, defendants are liable under the statute.

For all the reasons discussed above, the Court finds that Patrick has presented evidence regarding his ownership interest in LMA under an agreement between Christopher and Patrick and the transfer of assets from LMA to Frontline in the formation of Frontline. See, e.g., Stewart Aff. Exhs. B (Christopher Depo.), p. 122-25, 138-40; C (Reavis Depo.), p. 34-36, 45-49, 59-60, 77, 82, 86-88; D (Eiden Depo.), p. 34; E (Newberg Depo.), p. 14-16, 58. In addition, evidence was presented that these

transfers were outside of the usual course of business of LMA, and that the required notice was not given and the necessary shareholder approval was obtained before the transfer occurred. As such, Patrick has presented sufficient evidence to create a genuine issue of material fact on his claim for relief as a dissenting shareholder.

Accordingly, defendants' Motion for Summary Judgment should be denied as it relates to the dissenters' rights claim.

## IV. CONCLUSION

In summary, this Court concludes that this case is fraught with factual disputes as to the formation of LMA, the terms of the agreement between Patrick and Christopher resulting in Patrick owning 30% of LMA, and the formation and operation of Frontline. Resolution of these issues will require the fact-finder to weigh not only the documentary evidence, but the credibility of the witnesses on both sides of the dispute. Accordingly, defendants' motion for summary judgment should be denied as to Counts One through Fourteen and Count Sixteen, and granted as to Count Fifteen.

## V. RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that defendants' Motion for Summary Judgment, for Sanctions and Attorneys' Fees [Docket No. 106] be granted in part and denied in part. In this regard, defendants' motion should be denied with respect to

Counts One through Fourteen and Count Sixteen, and granted as to Count Fifteen; and defendants' motion for sanctions and attorneys' fees should be denied.

Dated: August 19, 2004

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before August 30, 2004 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before August 30, 2004.